IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

ANGELA J. COOK,                          )
                                         )
                Plaintiff,               )
                                         )
vs.                                      )          Case No. 12-cv-131-TLW
                                         )
MICHAEL J. ASTRUE,                       )
Commissioner of the Social Security      )
Administration,                          )
                                         )
                Defendant.               )

## OPINION AND ORDER

Plaintiff Angela J. Cook requests judicial review pursuant to 42 U.S.C. § 405(g) of the

decision of the Commissioner of the Social Security Administration ("Commissioner") denying

plaintiff's applications for period of disability and disability insurance benefits under sections

216(i) and 223(d) of Title II of the Act, 42 U.S.C. §§ 416(i) and 423 of the Social Security Act.

In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a

United States Magistrate Judge. (Dkt. # 13). Any appeal of this order will be directly to the Tenth

Circuit Court of Appeals.

## INTRODUCTION

When applying for disability benefits, a plaintiff bears the initial burden of proving that

he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled"

under the Social Security Act is defined as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. §

423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental

impairment or impairments are of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

The role of the Court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. at 1262. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The

evidence must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a).

## BACKGROUND

Plaintiff, then a 46-year old female, protectively filed an application for Title II benefits on February 27, 2008. (R. 13). Plaintiff initially alleged a disability onset date of June 1, 2006, but the date was amended to April 1, 2007[1] at the April 6, 2010 hearing. (Tr. 30). Plaintiff's last insured date under Title II was December 31, 2011. (R. 15).

Plaintiff initially alleged that she was unable to work due to issues with chronic obstructive pulmonary disease ("COPD"), emphysema, depression, anxiety, her gall bladder, scoliosis, an ulcer, and arthritis. (R. 204). Plaintiff's claim for benefits was denied initially on September 16, 2008, and upon reconsideration on February 2, 2009. (R. 62-64, 78-82, 86-88). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (R. 92-93). The ALJ held a hearing on April 6, 2010. (R. 23-61). The ALJ issued a decision on May 26, 2010, denying benefits and finding plaintiff not disabled because she was able to perform her past relevant work as a dispatcher, customer service representative, and shipping/packing clerk. (R. 10-22). The Appeals Council denied review, and plaintiff appealed. (R. 1-5). At plaintiff's request, this Court held a hearing on the merits on September 11, 2013. (Dkt. # 26).

---

[1] At the time of the hearing, plaintiff was employed part-time from her home as the manager of an apartment complex, a position she held since July 2005. Prior to April 1, 2007, plaintiff reported earning $1,100.00 per month in salary. On April 1, 2007 plaintiff's income structure changed from salary to commission, and she earned ten percent of the rental income, or approximately $800.00 to $850.00 per month. The ALJ determined that plaintiff's income had exceeded the agency threshold for substantial gainful activity ("SGA") before her amended onset date.

**The ALJ's Decision**

The ALJ found that plaintiff had not engaged in any substantial gainful activity since April 1, 2007, her amended onset date. (R. 15). Next, the ALJ found that plaintiff suffered the severe impairments of depression and anxiety, COPD, and scoliosis. (R. 16). However, none of plaintiff's severe impairments rose to the level of a listing. The ALJ gave particular consideration to listing 3.02 for chronic pulmonary insufficiency, listing 1.04 for scoliosis, and listings 12.04 and 12.06 for her mental impairments. (R. 16-18).

The ALJ then reviewed the medical evidence, plaintiff's testimony, and other evidence to determine plaintiff's residual functional capacity ("RFC"). (R. 10-22). Plaintiff testified that she could not vacuum because the dust produced impaired her breathing. Because of that, her boyfriend handled all of the household chores. (R. 18). Plaintiff shopped for groceries daily because she could not carry many bags, and claimed to be able to lift ten pounds or less. Id. She admitted to past use of methamphetamines and marijuana, but denied any current drug use. She said she "last abused alcohol while in her twenties." Id. Plaintiff said she could walk one to two blocks at a time, stand for an hour, and sit for 15 minutes before "feeling her sciatica." (R. 19). She said she must lie down for 15 minutes to an hour at least three to four times a day, and was unable to squat, bend, crouch, or crawl. She claimed poor grip strength, and said she could only climb six stairs at a time. Id. Plaintiff said that "pain prevented her from focusing for more than about an hour," and that she frequently forgot things. Id.

The ALJ noted that plaintiff's treating physician, Bradford J. Stephens, M.D., diagnosed her with COPD and advised her to stop smoking. Id. Based on the results of a pulmonary function report dated September 12, 2008, Robert Maul, Jr., D.O. recommended that plaintiff

undergo bronchodilator therapy. Dr. Stephens said that plaintiff's sciatica would "probably worsen as she aged." (R. 19).

In a Medical Source Statement dated March 24, 2010, Dr. Stephens opined that plaintiff could stand and/or walk for two hours of an eight hour workday, sit for two hours of an eight hour workday, walk for approximately two blocks without resting, occasionally lift and carry ten pounds, frequently lift and carry less than ten pounds, and would need to lie down three to four times daily for 15 to 20 minutes each time every day. (R. 19). Dr. Stephens said plaintiff could never twist, stoop, bend, crouch, squat, crawl, or climb stairs. Id. It was his opinion that plaintiff would miss at least four days a month if she were employed due to her impairments. Id.

On February 24, 2010, plaintiff received a psychological evaluation from Lindsey Brooks, Psy.D. Id. Dr. Brooks related plaintiff's subjective complaints of depression and anxiety symptoms after reviewing her history of abuse. The ALJ noted no objective testing performed by Dr. Brooks. Dr. Brooks ultimately diagnosed plaintiff with "major depressive disorder, moderate, recurrent, without psychotic features and generalized anxiety disorder," and assessed a GAF score of 55. Id. This GAF score indicated someone "with moderate psychological difficulty in social or occupational settings," but Dr. Brooks did not think plaintiff's impairment was "severe enough to interfere with her ability to perform daily tasks or her ability to perform an occupation." Id.

Dr. Brooks also completed a Medical Source Statement for plaintiff. This statement rated plaintiff with moderate limitation in her abilities to understand, remember, and carry out detailed instructions; maintain concentration and attention for extended periods of time; work in coordination with others; properly handle the general public; appropriately respond to criticism from supervisors; and, finally, complete a "normal workday and work week without interruptions

from psychologically based symptoms." Id. The ALJ pointed out that plaintiff saw Dr. Stephens on March 22, 2010, and that his report recited her subjective complaints, but did not include objective testing. (R. 20).

The ALJ discounted plaintiff's credibility by noting that she was working "at nearly the level of substantial gainful activity," and that it was the nature of her employment, rather than any physical or mental impairment, that caused her to work only three to four hours a day. (R. 20). The ALJ also noted that although plaintiff testified she could not perform household chores due to irritants and weakness, she indicated on an agency form that she could "vacuum in small intervals, wash[] dishes, ma[k]e beds, [do] laundry occasionally, and perform[] light cooking." Id. The ALJ said that based on plaintiff's "current work activity and activities at home, she appears to be able to do more work than she alleged." Id. The ALJ pointed out that Dr. Stephens "only used the terms 'cough and congestion'" to describe plaintiff's breathing problems at her March 22, 2010 visit. The ALJ also noted that although Dr. Stephens had advised plaintiff to quit smoking, she continued to smoke at least 10 cigarettes daily. Id.

Still referencing plaintiff's March 22, 2010 visit, the ALJ said that although plaintiff "made allegations of great physical limitations in her testimony and in her conversation with Dr. Stephens," that Dr. Stephens "listed only 'right hip pain' in the 'Muscular Skeletal' entry of his review of systems. [Plaintiff] has sciatica, but that and her hip pain are insufficient causes for the levels of physical limitations she alleges." (R. 20-21).

The ALJ gave Dr. Brooks' opinion that plaintiff "had only a moderate limitation in the ability to complete a normal workday and work week without interruptions from psychologically based symptoms" "considerable weight" because it was consistent with both the opinions of the Disability Determination Services physicians, and the evidence of record regarding plaintiff's

mental limitations. The ALJ assigned Dr. Stephens' medical source statement the "least weight," explaining that Dr. Stephen's opinion was inconsistent with "his own [records and] other evidence." (R. 21).

The ALJ found that plaintiff retained the residual functional capacity to perform "a limited range of light work as defined in 20 CFR 404.1567(b)," with "no concentrated exposure to respiratory irritants," and limited plaintiff to "simple and some complex tasks and to superficial interactions with coworkers, supervisors, and the public." (R. 18). The ALJ noted that plaintiff "is currently working at nearly the substantial gainful activity level in a position she held before her alleged onset date," and that the evidence of record from Dr. Brooks and the agency physicians, as well as testimony from the vocational expert, would allow her to perform her past relevant work as a dispatcher, customer service representative, and shipping/packing clerk. (R. 22). The ALJ held that plaintiff was not disabled. Id.

**Plaintiff's Medical Records**

The medical records show plaintiff first received a diagnosis of COPD from Jeff Honderich, M.D. on January 18, 2005. (R. 281). Plaintiff received treatment from Dr. Honderich from January 2005 through May 2007 for ailments ranging from congestion to anxiety and high blood pressure. (R. 268-285). She began receiving treatment from Dr. Stephens in June 2007.[2] After examination, Dr. Stephens diagnosed plaintiff with anxiety, stable COPD, and tobacco abuse. (R. 297). Plaintiff returned to Dr. Stephens on October 23, 2007, requesting medication refills, a flu shot, and complaining of neck pain from an altercation with her step daughter three weeks prior. (R. 292). Dr. Stephens diagnosed her with unspecified neck pain, recommending

---

[2] June 25, 2007 is the first date for which there are records of a visit by plaintiff to Dr. Stephens; however, the notes from the June 25, 2007 visit state that plaintiff is an "existing patient." (R. 295).

she continue use of ibuprophen, stable COPD, controlled high blood pressure, stable anxiety, and he reported that her tobacco use, while he had "encouraged [her] to stop," had decreased to one pack per day. (R. 294). Plaintiff next visited Dr. Stephens on January 9, 2008 for a three month follow up visit, and presented with complaints of "multiple arthritic pains, rt shoulder/neck," and continued problems with her step daughter. (R. 289). Although his physical examination revealed that plaintiff's lungs were "clear to auscultation" with "normal effort," and that her remaining examination results were normal, Dr. Stephens diagnosed plaintiff with benign hypertension ("improved blood pressure"), tobacco abuse ("start Chantix"), anxiety ("increase medication to TID. … Refer to Dr. Long."), COPD, not otherwise specified ("she needs to stop smoking and continue Albuterol."). (R. 291). Plaintiff's next visit with Dr. Stephens was on April 16, 2008, again for a three month follow up. She reported that she was still trying to stop smoking, and had decreased to 3-5 cigarettes a day from two packs per day, and that her relationship with her step daughter had improved. (R. 286). Dr. Stephens examined plaintiff, found normal results, and diagnosed her with benign hypertension ("slight elevation. Continue to follow."), tobacco abuse ("stopping"), COPD NOS ("stable"), and stable anxiety. (R. 288).

Saad M. Al-Shathir, M.D. performed a consultative physical examination of plaintiff on August 21, 2008. At that visit, she complained of "being short of breath with recurrent cough from chronic smoking," and having "chronic anxiety and depression." (R. 320). After examining plaintiff, Dr. Al-Shathir reported "expiratory wheezes with barrel chest"; normal coordination and muscle tone; grip strength 5/5; normal gait speed and stability without any assistive devices; no spinal deformitites or scoliosis; a full range of spinal motion; and "no active inflammatory synovitis or arthritis." (R. 320-21). He opined that plaintiff could "read and wrist, [sic] sit up,

transfer, reach, bend, manipulate objects in her hands, do her ADL, drive a car, working managing a 24-unit apartment complex which is mainly office work." (R. 321).

Plaintiff received a pulmonary function test from consultative examiner Robert V. Maul, Jr., D.O. on September 12, 2008. This test showed "possible early obstructive pulmonary impairment," and because her scores improved after using an Albuterol inhaler, Dr. Maul speculated that plaintiff would benefit from bronchodilator therapy. (R. 329-333).

Plaintiff did not return to Dr. Stephens until November 17, 2008. (R. 335-37). Plaintiff's reported complaints at this visit were "more shortness of breath, cold and cough," she requested a change in her COPD medication, and "wanted to find out if we are getting her disability paperwork." (R. 335). Dr. Stephens noted "course wheezes" in her respiration, and changed plaintiff's COPD medication to Spiriva, and also gave her a prescription for Cipro (used to treat infections), noted her high blood pressure was controlled, again encouraged her to stop smoking, and advised her to continue her current medication (Xanax) for anxiety. (R. 337).

According to the record, plaintiff did not return to Dr. Stephens for almost a year. During her October 12, 2009 visit, plaintiff wanted a medical checkup and wished to discuss the swine flu vaccine. (R. 347). Examination revealed "wheezes on right" with normal respiratory effort, and normal results on plaintiff's remaining systems. (R. 348-49). Dr. Stephens diagnosed plaintiff with controlled hypertension, tobacco abuse, stable COPD, and stable anxiety. (R. 349). Plaintiff returned to Dr. Stephens on November 16, 2009 with complaints of right lower back pain, neck pain, bilateral shoulder pain, and trouble breathing. (R. 350). An otherwise normal examination revealed "bilateral wheezes" with normal effort for her respiratory system, normal gait, with tenderness in the "right sciatic area to palp[itation]. Shoulders and post[erior] lower neck tight and feels better with palpation." (R. 351-52). Dr. Stephens diagnosed her with

"Sciatica (Try Ultram), Backache (unspec) Try Ultram," and "Hypertension, Benign (Elevated. Will treat pain.)." (R. 352).

Plaintiff returned to Dr. Stephens on January 11, 2010 to refill her prescription of Xanax. She said she was "otherwise doing well with no concerns," but was "having issues affording Spiriva and would like to take Chantix and thinks her boss might pay for the Chantix." (R. 353). After a fifteen minute examination which showed normal results, Dr. Stephens diagnosed plaintiff with "anxiety (refill Xanax), tobacco abuse (Chantix; patient will call us if she finds a way to afford this, no rx was given today), COPD NOS (gave sample of Spiriva, Barbi did check to see if she could get free meds for patient since she has no insurance and apparently [patient] salary too high), hypertension (essential); Benign (will follow; patient states she has been out of Xanax for a couple days and is very stressed, will follow once she starts back on med)" and advised plaintiff to follow up in three months. (R. 355).

On referral from her attorney, plaintiff visited Lindsey Brooks, Psy.D. on February 24, 2010 for a psychological evaluation "to determine her current levels of cognitive, emotional, and behavioral functioning in order to assist in her application for disability benefits." (R. 341-45). Upon examination and "clinical findings," Dr. Brooks opined that plaintiff's "emotional disturbance [was] not of the severity and magnitude sufficient enough to interfere with her ability to consistently perform daily tasks, and preclude her from performing an occupation." (R. 345). Dr. Brooks noted that plaintiff experienced "significant symptoms of anxiety and depression, but she is currently performing an occupation on a daily basis," and recommended that plaintiff continue medicational management of her symptoms and begin psychotherapy to "deal with her emotional distress." (R. 345). Subsequently, Dr. Brooks completed a Medical Source Statement dated February 25, 2010 wherein she opined that plaintiff was moderately limited in her ability

10

to understand, remember, and carry out detailed instructions, to maintain attention and concentration for extended periods, to work with others without being distracted by them, to complete a normal work day without interruption from her symptoms, to interact appropriately with the general public, and to accept instruction and respond to criticism from supervisors. (R. 362-63). Dr. Brooks noted plaintiff could understand, remember, and carry out simple instructions, "make judgment[s] that are commensurate with the functions of unskilled work," respond appropriately to supervisors in a work setting, and deal with routine changes in a work setting. (R. 363).

Plaintiff returned to Dr. Stephens on March 22, 2010 with "multiple issues" including back pain which radiated up her back, "pins and needles" with the back pain, bilateral ear pain, a sore throat, and a desire to quit smoking. A lengthy "history of present illness" section of this visit's notes shows that plaintiff reported that "the only way she can keep comfortable is laying down," that she was unable to sit or stand "very long," that she experienced "tingling/pins and needles" in her hands and feet when she coughed, that she was concerned about hereditary heart disease (but denied any chest pain), that she could only walk one city block, that she could sit for 15 minutes before needing to change her position, that she could stand for 20 minutes before needing to change positions, that she could only work about three hours of an eight hour workday, that she could not "use cleaning solutions because of her breathing," that she laid down three to four times per day for 15 minutes to an hour, that she could rarely climb stairs or kneel, that she could never twist, stoop, bend, crouch, squat, crawl, or climb ladders, that she could occasionally grip, reach, or handle objects, that she could frequently "feel and finger," and that in a "typical work month [she] would be likely to miss work more than 4 times a month." (R. 365). Physical examination revealed normal results in every area except that "pain with palpation to

lumbar paraspinal muscles" was noted with a normal gait. (R. 365-66). Her diagnoses were "COPD NOS (Spiriva sample given; cont current tx plan); backache (unspec) (extensive amount of paperwork went over with patient in office visit. Start Cymbalta 30mg PO daily and Lortab for pain)." (R. 366).

On March 24, 2010, Dr. Stephens completed a Medical Source Statement wherein he opined that plaintiff's major diagnoses were "anxiety, depression, COPD, hypertension, chronic back pain, [and] scoliosis," and that her back pain and scoliosis would "probably worsen with age." (R. 357). He said that plaintiff was not "a malingerer"; that depression and anxiety did contribute to her problems, and that while her symptoms would "frequently" interfere with her ability to pay attention and concentrate during a normal workday, she could perform a "moderate stress job." (R. 357-58). As to plaintiff's physical limitations, Dr. Stephens stated she could walk one to two blocks without rest, sit for 15 minutes at a time before needing to change position, stand for 20 minutes at a time before changing position, and sit and stand each for "about 2 hours total" in an eight hour workday. (R. 358). He said she would need a position that would allow her to change positions at will, and that there was a medical need for plaintiff to lie down or elevate her feet three to four times daily for 15 minutes to an hour daily. (R. 358-59). Dr. Stephens opined that plaintiff could lift less than 10 pounds frequently, 10 pounds occasionally, twenty pounds "rarely," and never lift 50 pounds. She should also never twist, stoop, bend, crouch or squat, crawl, or climb ladders, and rarely kneel or climb stairs. (R. 359). He said that plaintiff could occasionally reach, handle, and grip, and frequently finger and feel. (R. 360). Dr. Stephens said that plaintiff would have "good days" and "bad days," and that in his opinion, she would miss an average of four days of work per month. Id.

The final report from Dr. Stephens in this record, dated June 8, 2010, showed that plaintiff complained of a "pinched nerve in [her] right shoulder for one month," and "lower back pain for one week." (R. 369). Again, physical examination yielded normal results with the exception of slightly reduced right hand grip strength (4+/5). (R. 370). Dr. Stephens ordered x-rays of plaintiff's back and neck, but the results are not in this record. Plaintiff was diagnosed with "radiculitis, cervical/brachial" and "sciatica." Id.

**The ALJ Hearing**

At the April 6, 2010 hearing, plaintiff's attorney amended plaintiff's onset date from June 1, 2006 to April 1, 2007 because her income before April 1, 2007 rose to the level of substantial gainful activity. (R. 29-30). The ALJ first clarified plaintiff's past work, then plaintiff testified that she obtained her current position when her niece and nephew owned the apartment complex. (R. 36). Plaintiff said prior to their bankruptcy, her family members paid her $1,100.00 per month plus provided a house where she lived rent free. (R. 39-40). After her family members lost the business, she said she retained her position with the new owners, receiving a commission salary of ten percent of the rental income, which reduced her income to $850.00 per month and she was also required to pay $350.00 per month in rent. (R. 36-37). Plaintiff described her position as part time, and said that since she worked from her home, she was able to take breaks whenever she needed. (R. 41). She claimed to have "good days and bad days," saying at times she did not want to get out of bed or answer the phone. (R. 42).

Plaintiff said that she did not graduate high school, but received her GED "after [her] junior year." She lives with her boyfriend, who performs the household chores. She said that she is unable to dust or vacuum because it aggravates her breathing. (R. 45). She makes short trips daily to a local grocery store, buying only a few things at a time. (R. 46). Plaintiff acknowledged

that her doctor has recommended that she stop smoking, and admitted to still smoking "about a pack and a half a day," a reduction from "two or three packs a day." Id. She said that she quit for a month with Chantix, but could not afford to keep buying it. Id. The ALJ established from plaintiff that Chantix cost her $220.00 per month, and plaintiff's attorney noted that at $3.20 per pack, smoking a pack and a half a day cost plaintiff $270.00 per month.[3] (R. 51).

Plaintiff said that Dr. Stephens was her family physician and had treated her for the past three years for both mental and physical complaints. (R. 47). With regard to her own opinion of her limitations, plaintiff claimed to be able to lift ten pounds or less without pain, walk "one to possibly two blocks" without aggravating her symptoms, sit approximately 15 minutes, and stand for about an hour without a break. (R. 49). Plaintiff said that she needs to lie down at least three to four times a day for "anywhere from 15 minutes to an hour." Id. She said that she has difficulty grabbing things, and felt she could "handle and grip at least occasionally." Id. She said that she could not stoop, bend, crouch, or crawl, but could climb six stairs without needing to rest. (R. 50). Plaintiff claimed that she could only focus "without losing [her] attention or being distracted" for about an hour due to her pain. Id.

The vocational expert testified that plaintiff had performed past relevant work as an apartment manager (skilled, SVP 5, sedentary exertional level), an assistant manager in a restaurant (skilled, SVP 5, light exertional level), a shipping and packing clerk (semi-skilled, SVP 3, light exertional level), an assistant property manager (skilled, SVP 5, light exertional level), a customer service representative (semi-skilled, SVP 3, sedentary exertional level), a

---

[3] The ALJ asked plaintiff the cost of one pack of cigarettes, to which she replied $3.20 a pack and affirmed that she smoked a pack and a half a day. Plaintiff's attorney then stated "[t]hat's about $270 a month." (R. 51). Taking plaintiff at her word regarding cigarette prices (a quick search on the internet indicates that a pack of cigarettes in Oklahoma is around $5 a pack), a pack and a half a day habit would cost approximately $144.00 per month.

dispatcher (semi-skilled, SVP 3, sedentary exertional level), and a telemarking manager (skilled, SVP 5, sedentary exertional level). (R. 54-56).

The ALJ posed three hypothetical questions to the vocational expert. The first assumed someone plaintiff's age with her education and work background, with no exertional limitations, but limited to simple and some complex tasks, and "superficial interaction with coworkers, supervisors, and the public." (R. 56). The vocational expert stated that such an individual would be able to return to plaintiff's past relevant work as a dispatcher, customer service representative, shipping and packing clerk, or telemarketer. Id. The second assumed the same facts as the first hypothetical, but changed the exertional level to light work, and added the need to avoid "constant exposure to respiratory irritants such as dust, fumes, and gases, and the same mental limitations." (R. 56-57). The vocational expert again confirmed the same four jobs that were available in the first hypothetical would still be viable. (R. 57). The vocational expert also listed the "other jobs" of parking lot attendant, and arcade attendant. Id.

Finally, the ALJ posed a hypothetical that assumed that the limitations found in Dr. Stephens' medical source opinion were true. The vocational expert stated that such an "individual could perform the work as a property or apartment manager as [plaintiff was] performing it, your honor," but noted that no other competitive employment would be available to her. (R. 58).

## ANALYSIS[4]

Plaintiff raises two issues on appeal: First, plaintiff contends that the ALJ erred in analyzing the opinion of plaintiff's treating physician, Dr. Stephens. Second, plaintiff argues that

---

[4] This analysis takes into consideration the briefing of record and oral argument from both sides during the September 11, 2013 hearing. (Dkt. # 26). Both counsel were well prepared, and the argument from each was helpful to the Court.

the ALJ failed to re-contact Dr. Stephens to "clarify issues identified with that opinion." (Dkt. # 22). The Commissioner argues that the ALJ gave specific reasons for rejecting Dr. Stephens' opinion and that the ALJ's duty to re-contact Dr.Stephens was not triggered, as the record contains ample evidence to evaluate his opinion. (Dkt. # 23).

**Treating Physician Opinion**

Ordinarily, a treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also Hackett, 395 F.3d at 1173-74 (citing Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003)). If the ALJ discounts or rejects a treating physician opinion, the ALJ is required to explain her reasoning for so doing. See Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987) (stating that an ALJ must give specific, legitimate reasons for disregarding a treating physician's opinion); Thomas v. Barnhart, 147 Fed.Appx. 755, 760 (10th Cir. 2005) (holding that an ALJ must give "adequate reasons" for rejecting an examining physician's opinion and adopting a non-examining physician's opinion).

In determining whether the opinion should be given controlling authority, the analysis is sequential. First, the ALJ must determine whether the opinion qualifies for "controlling weight," by determining whether it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and whether it is consistent with the other substantial evidence in the administrative record. Watkins, 350 F.3d at 1300. If the answer is "no" to the first part of the inquiry, then the analysis is complete. If the ALJ finds that the opinion is well-supported, she must then confirm that the opinion is consistent with other substantial evidence in the record. Id.

"[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

However, even if the ALJ finds the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the record, treating physician opinions are still entitled to deference and must be evaluated in reference to the factors enumerated in 20 C.F.R. § 404.1527, and § 416.927. Those factors are:

> (1) the length of the treating relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Watkins, 350 F.3d at 1301 (citing Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001)). The ALJ must give good reasons in his decision for the weight he ultimately assigns the opinion. Id. (citing 20 C.F.R. § 404.1527(d)(2)). If the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so. Id. (citing Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1990)). The reasons must be of sufficient specificity to make clear to any subsequent reviewers the weight the adjudicator gave to the treating physician's opinion and the reasons for that weight. Anderson v. Astrue, 319 Fed.Appx. 712, 717 (10th Cir. 2009) (unpublished).[5]

However, if a treating physician's opinion addresses an issue ordinarily reserved to the Commissioner, such as a claimant's ability to work or the ultimate question of disability, the ALJ may not give controlling weight to that opinion. See Butler v. Astrue, 410 Fed.Appx. 137, 142 (10th Cir. 2011) (citing 20 C.F.R. §§ 404.1527(e), 416.927(e)) (unpublished). "[T]reating source

---

[5] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p. The ALJ may not ignore those opinions but "must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record," using the factors set forth in 20 C.F.R. § 404.1527(d), and § 416.927(d), cited *supra*.

Here, plaintiff argues that the ALJ incorrectly rejected the treating physician's opinion, by focusing on a single visit on October 12, 2009, when Dr. Stephens found plaintiff's COPD and anxiety both stable. (Dkt. # 22 at 9-10). Plaintiff argues that Dr. Stephens' March 22, 2010 opinion, which is later in time, should have formed the ALJ's decision. Plaintiff asserts that even the vocational expert stated that Dr. Stephens' March 24th opinion would "preclude Plaintiff from any competitive work," and that the ALJ's reasoning for rejecting Dr. Stephens' opinion is "not supported by the record as a whole and does not follow the criteria set forth in the Commissioner's own regulations for the evaluation of medical source opinions." (Dkt. # 22 at 8-9).

However, careful review of the record (summarized *supra*) shows that Dr. Stephens' March 24th opinion is an almost direct recitation of plaintiff's subjective complaints made during her visit to him two days prior. More importantly, the records from plaintiff's October 12, 2009 visit and her March 22, 2010 visit were before the ALJ for consideration prior to her decision, and with respect to Dr. Stephens' opinion the ALJ concluded that "[t]he medical and other evidence in the record also fails to support the extreme physical and mental limitations described by Dr. Stephens," and said that plaintiff's "own work activity is inconsistent with the limitations Dr. Stephens described." (R. 21). The ALJ stated that she gave more weight to Dr. Brooks' opinion and those of the DDS medical sources regarding plaintiff's mental limitations

than she gave to those of Dr. Stephens.[6] The ALJ further noted that while "Dr. Stephens does not explicitly state that the claimant is disabled or unable to work, [] that conclusion could be easily drawn from his medical source statement. The statement, however, is not supported by his own or other evidence. It is inconsistent with that evidence, thereby denying his opinion controlling or even great weight." Id.

The undersigned finds that although the ALJ could have cited more evidence contained in Dr. Stephens' own treatment notes of "stable" findings beyond the October 12, 2009 visit (including the March 22, 2010 visit), remanding this case for the ALJ to include further reference to existing, obviously reviewed medical evidence, would not change the outcome; therefore, even if the ALJ erred, the undersigned finds that error to be harmless and sees no reason for a remand on this issue. See Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004) (A finding of harmless error is appropriate when, based on material the ALJ did consider, although improperly, "no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.")

**Re-contacting the Treating Physician**

Plaintiff argues that the ALJ should have re-contacted Dr. Stephens if she "did not believe [that] the treatment notes of Dr. Stephens provided enough explanation or support for his medical opinion." (Dkt. # 22 at 10). As the Commissioner argued in her response, "it is unnecessary for an ALJ to re-contact a treating physician when the ALJ finds the evidence adequate for consideration, but disagrees with the physician's [opinion] about the claimant's restrictions and gives valid reasons for rejecting it, as the ALJ did here." (Dkt. # 23 at 7) (citing Kilpatrick v. Astrue, 502 Fed.Appx. 801, 804-06 (10th Cir. 2012) (unpublished) (citing White v.

---

[6] During the September 11, 2013 hearing, plaintiff's counsel agreed that plaintiff's mental impairments were not disabling.

Barnhart, 287 F.3d 903, 907-09(10th Cir. 2001)). The Tenth Circuit's precedent is consistent with the Commissioner's position: an ALJ's duty to re-contact a treating physician is triggered not by "the rejection of the treating physician's opinion," but by the "inadequacy of the 'evidence' the ALJ 'receive[s] from [the claimant's] treating physician,'" White, 287 F.3d at 908 (citing 20 C.F.R. § 416.912(e)). In the instant case, ample evidence exists in Dr. Stephens' own treatment records to refute his opinion of plaintiff's work limitations, and based on this Court's limited review, the undersigned declines to second guess the ALJ's decision.

## CONCLUSION

For the reasons stated above, the decision of the Commissioner finding plaintiff not disabled is AFFIRMED.

SO ORDERED this 25th day of September, 2013.

_____

T. Lane Wilson
United States Magistrate Judge